1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    ARMEN BEEMAN,                           CASE NO. C21-235 MJP

11                        Plaintiff,          ORDER GRANTING
                                              DEFENDANT'S MOTION FOR
12            v.                              SUMMARY JUDGMENT

13    ALEJANDRO MAYORKAS,

14                        Defendant.

15

16         This matter comes before the Court on Defendant Alejandro Mayorkas' Motion for

17    Summary Judgment (Dkt. No. 29). Having reviewed the Motion, Plaintiff Armen Beeman's

18    Response to the Motion for Summary Judgment (Dkt. No. 36), the Reply (Dkt. No. 44), and all

19    supporting materials in the record, the Court GRANTS Defendant's Motion for Summary

20    Judgment.

21                                    **BACKGROUND**

22         Beeman began working for Customs and Border Protection ("CBP") in 2009. (Resp. at

23    3.) After completing training, he began work as a Border Patrol Agent in Sumas, Washington.

24

1    (Id.) Beeman's tenure with CBP became tumultuous in 2014, when he was arrested for a DUI

2    after crashing his motorcycle. (Mot. for SJ at 4.) As a result of the arrest and Beeman's behavior

3    during the arrest, CBP suspended him for fourteen days for "Conduct Unbecoming."

4    (Declaration of Heather Costanzo, Exhibit L (Dkt. No. 31-12); Exhibit F, Deposition of Chris

5    Bippley at 47:24-48:6 (Dkt. No. 31-6).) Blaine Sector's Acting Deputy Chief Patrol Agent at the

6    time, Anthony Holladay, sustained the charge of Conduct Unbecoming and upheld the

7    suspension. (Costanzo Decl. Ex. M (Dkt. No. 31-13).) With the aid of his Union representative,

8    Beeman fought the suspension, and an arbitration proceeding was held in November 2015. (First

9    Am. Compl. ¶ 4.11 (Dkt. No. 3).) The arbitrator reduced Beeman's suspension from fourteen

10   days to three days. (Id.) Beeman alleges that during the arbitration proceeding, while in a locker

11   room bathroom, he overheard Holladay say, "he was 'not going to let some Northern Border

12   Intern faggot work here' if he could help it." (Declaration of Mark Davis, Exhibit B, Deposition

13   of Armen Beeman at 205:4-16 (Dkt. No. 37-2).) Beeman, who identifies as bisexual, believed

14   Holladay to be referring to him when Holladay stated that. Holladay, on the other hand, denies

15   that he ever made that comment. (Davis Decl. Ex. C, Deposition of Anthony Holladay at 118:2-

16   119:14 (Dkt. No. 37-3).)

17        Following Beeman's 2014 incident, he was pulled over by a Lynden police officer for

18   traffic violations in July 2015. (Costanzo Decl. Ex. O (Dkt. No.31-15).) The officer who pulled

19   Beeman over later reported him to CBP management, claiming that during the stop Beeman

20   allegedly told the officer "see if I cover you." (Id.; Costanzo Decl. Ex. P (Dkt. No. 32).) An

21   administrative inquiry into the stop was conducted, and after review, CBP determined that

22   allegation that Beeman had acted unprofessionally was unsubstantiated. (Costanzo Decl. Ex. R

23   (Dkt. No. 32-2.)

24

1    Beeman was arrested again in April 2016 for obstructing the arrest of his girlfriend who

2    was suspected of driving under the influence. (Costanzo Decl. Ex. T (Dkt. No. 32-4).) At the

3    time of the arrest, Beeman had both his CBP badge and service weapon on him. (Davis Decl. Ex.

4    B, Beeman Dep. 184:15-25.) Due to Beeman's behavior at the scene, the Sedro-Woolley Police

5    Chief sent CBP a letter about Beeman's conduct and asked that he be accompanied by a

6    supervisor in any future, work-related visits he many have to the Sedro-Woolley Police

7    Department. (Costanzo Decl. Ex. V at USAO_412 (Dkt. No. 32-6).)

8    The Office of Professional Responsibility investigated Beeman's arrest and ultimately

9    referred the matter to the CBP Discipline Review Board, which creates a panel as needed for

10   particular disciplinary issues. (Id. Ex. V, Ex. Z (Dkt. No. 32-10), Ex. E. Deposition of Anthony

11   Holladay at 84:19-33 (Dkt. No. 31-5), Ex. F. Bippley Dep. at 93:3-13.) The Discipline Review

12   Board recommended Beeman be removed from federal service for conduct unbecoming and

13   failure to be forthcoming. (Id. Ex. Z.) The then-Acting Chief Patrol Agent for the Blaine Sector,

14   Chris Bippley, sustained the charges set forth by the Discipline Review Board, but offered

15   Beeman a Last Chance Agreement, rather than terminate him. (Id. Ex. C (Dkt. No. 31-3).)

16   Beeman signed the Last Chance Agreement on September 7, 2017, which required him to serve a

17   thirty (30) day suspension and refrain from committing any form of misconduct on or off duty

18   for the next three years. (Id. Ex. BB (Dkt. No. 33-1).)

19   When Beeman returned from his suspension on October 16, 2017, CBP assigned him to

20   administrative duties, one of which was using a pressure washer. (Mot. for SJ at 8-9.) Shortly

21   after returning, CBP received reports from three employees complaining that their assigned

22   vehicles smelled strongly of gasoline. (Costanzo Decl. Ex. BB, Ex. GG at USAO_00451-454

23   (Dkt. No. 33-6).) The vehicle logs for these cars showed inconsistencies in the fuel levels when

24

1  compared to the gas purchase receipts. (Costanzo Decl. Ex. GG at USAO_00448.) Beeman was

2  the last person who fueled each vehicle. (Id. at USAO_00452.) Beeman claims that he went to

3  fill up the gas container for the pressure washer, as well as the vehicles, and he placed the gas

4  container inside the vehicles, and apparently the container leaked. (Costanzo Decl. Ex. RR,

5  Deposition of Armen Beeman at 169:4-170:20 (Dkt. No. 45-2).) But CBP officials receiving the

6  reports were not aware of a reason that Beeman would be filling up a gas container. (Costanzo

7  Decl. Ex. GG at USAO_00451.) The matter was referred to the Office of Professional

8  Responsibility to investigate and determine whether Beeman was misappropriating funds and

9  improperly using his Government fuel card to fill up gas cans. In December 2017, Bippley

10  became aware of the investigation into Beeman and terminated him for violating CBP policies in

11  violation of the Last Chance Agreement. (Id. Ex. II.) Beeman claims the reason for his

12  termination was pretextual for discrimination on account of his bisexuality.

13                                     **ANALYSIS**

14  **A.    Legal Standard**

15          Summary judgment is proper if the pleadings, depositions, answers to interrogatories,

16  admissions on file, and affidavits show that there is no genuine issue of material fact and that the

17  moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant bears

18  the initial burden to demonstrate the absence of a genuine dispute of material fact. Celotex Corp.

19  v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute over a material fact exists if there is

20  sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson

21  v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986). On a motion for summary judgment, "[t]he

22  evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

23  favor." Id. at 255.

24

1    The Ninth Circuit imposes a high standard for granting summary judgment in

2    employment discrimination cases. The Court has stated that "very little evidence" is required to

3    survive summary judgment because "the ultimate question is one that can only be resolved

4    through a searching inquiry—one that is most appropriately conducted by the factfinder, upon a

5    full record." Schnidrig v. Columbia Mach., Inc., 80 F.3d 1406, 1410 (9th Cir. 1996) (internal

6    quotation marks and citation omitted). Additionally, "[t]he requisite degree of proof necessary to

7    establish a prima facie case for Title VII. . . on summary judgment is minimal and does not even

8    need to rise to the level of preponderance of the evidence." Wallis v. J.R. Simplot Co., 26 F.3d

9    885, 889 (9th Cir. 1994).

10        In order to establish a prima facie case of discrimination, a plaintiff must show (1) that he

11   belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an

12   adverse employment action; and (4) similarly situated individuals outside his protected class

13   were treated more favorably. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802

14   (1973). If the plaintiff establishes a prima facie case, the burden of production shifts to the

15   employer to articulate a legitimate, nondiscriminatory reason for the employment decision. Id.

16   Although the burden of production shifts to the defendant at this point, the burden of proof

17   remains with the plaintiff at all times. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,

18   253 (1981). If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff

19   to show that the articulated reason is a pretext for discrimination. McDonnell Douglas, 411 U.S.

20   at 804.

21

22

23

24

**B.     Beeman Fails to Establish a Prima Facie Case**

The main issues at dispute are whether Beeman has established a prima facie case, and whether he can show that the reasons for his termination are pretextual. The Court finds Beeman fails on both grounds.

**1.     CBP's Knowledge of Beeman's Membership in a Protected Class**

Beeman has demonstrated there is sufficient evidence that a trier of fact could find that CBP knew of Beeman's sexual orientation. A plaintiff fails to establish a prima facie Title VII discrimination claim if he demonstrates that he belongs to a protected class, "but there is no showing by direct or indirect evidence that the decision-maker knew this fact." Robinson v. Adams, 846 F.2d 1315, 1317 (9th Cir. 1987). The two supervisors at issue in this case, Bippley and Holladay, both testified that neither was aware of Beeman's sexual orientation while Beeman was employed by CBP. (Costanzo Decl. Ex. F, Bippley Dep. at 79:1-80:5; Ex. E, Holladay Dep. at 151:17-21.) Although the credibility of these depositions could be a triable issue, the question is whether Beeman has placed that credibility in doubt. See Robinson, 846 F.2d at 1317. To answer that, the Court needs to determine whether the evidence put forth by Beeman through his deposition testimony is admissible.

**a.     Hearsay**

Defendant alleges that the evidence put forth by Beeman, which could demonstrate that Holladay was aware of his sexual orientation, contains inadmissible hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804, or 807." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 778 (9th Cir. 2002).

1   Here, Beeman claims that the husband of a woman he had an affair with emailed Beeman

2   and left Beeman a voicemail stating that he contacted Holladay and informed him that Beeman

3   was bisexual. (Costanzo Decl. Ex. A, Deposition of Armen Beeman at 77:16-78:16 (Dkt. No. 31-

4   1).) Beeman did not personally see the contents of any email sent to Holladay but stated that the

5   email he received "was a summary of what had been disclosed to Mr. Holladay." (Id. Ex. A,

6   Beeman Dep. at 81:24-82:2; 86:6-8.) Beeman was similarly not present for any phone call that is

7   alleged to have occurred between Holladay and this individual. (Id. Ex. A, Beeman Dep. at 87:4-

8   20.) And Beeman no longer has the email or voicemail sent to him. (Id. Ex. A, Beeman Dep. at

9   87:18-25.) CBP conducted a search of its systems, which automatically copies and saves all

10  emails dating back to 2008 and did not find the alleged email. (Declaration of Elaine Dismukes

11  (Dkt. No. 30).) Absent any supporting documentation, Beeman's testimony is being offered to

12  prove the truth of the matter asserted, i.e., that this individual did in fact call and email Holladay

13  to inform him of Beeman's sexual orientation, and therefore qualifies as hearsay. These

14  statements do not fall into any exception, and Beeman does not even attempt to argue that it

15  does. As such, the Court finds these statements inadmissible.

16      Additionally, Defendant seeks to exclude a screenshot of an online post that stated

17  Beeman "tried to have sex with another one of those Border Patrol guys." (Id. Ex. A, Beeman

18  Dep. at 94:18-25, Ex. RR, Beeman Dep. at 95:1:11; 96:9-12, Ex. MM.) Defendant argues that

19  there is an issue with the authentication for the screenshot. "To satisfy the requirement of

20  authenticating or identifying an item of evidence, the proponent must produce evidence

21  sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901.

22  One way evidence can be authenticated is via testimony of a witness with knowledge. Fed. R.

23  Evid. 901(b).

24

1    Here, Beeman testified that he took the screenshot, though he does not remember exactly

2    when. (Costanzo Decl. Ex. A, Beeman Dep. at 89:11-24.) However, the user who posted the

3    comments about Beeman went by the screen name BnB. (Id. Ex. A, Beeman Dep at 190:22-25,

4    Ex. MM.) Beeman does not know what that name is in reference to, but he believes it is the

5    husband of the wife he had an affair with. (Id. Ex. A, Beeman Dep. 191:1-3.) The website is no

6    longer available. But Beeman's testimony is sufficient because it was given under oath. Though

7    the Ninth Circuit does not appear to have a case on point, the Eighth Circuit does. See United

8    States v. Needham, 852 F.3d 830, 836 (8th Cir. 2017) (admitting an archived screenshot from a

9    website that was disabled, based on the testimony of a federal agent who had viewed the website

10   before it was disabled and confirmed that the screenshot was the same as the formerly public

11   website content). The Court is inclined to follow the Eighth Circuit's precedent here and find

12   Beeman's testimony sufficient to authenticate the screenshot.

13   However, the screenshot still qualifies as hearsay and is therefore inadmissible. There is

14   nothing about the screenshot to indicate it was included in an email or that it was written by the

15   husband of the woman Beeman had an affair with. Although the post is not being offered to

16   prove the truth of the matter asserted, Beeman seeks to draw the inference that this document

17   was submitted to Holladay or someone else at CBP, as a way to demonstrate CBP's knowledge

18   of his sexual orientation. But Beeman cannot make such an inference as he never saw the email

19   or heard the voicemail allegedly sent to Holladay. And he has submitted no evidence to suggest

20   that anyone at CBP ever saw the post. See Orr 285, F.3d at 779 (finding that an inference that

21   documents were submitted depended on whether the individual actually saw the documents,

22   otherwise the statement is hearsay). Similarly to Orr, Beeman's inference on whether the post

23   was submitted to anyone at CBP depends on Beeman actually seeing the post at CBP. Because

24

he has not done that, the Court finds the post is hearsay. And since there are no applicable exceptions, the screenshot is inadmissible.

### b.   Beeman's Remaining Evidence

Even with the information allegedly relayed to Holladay excluded as hearsay, Beeman still proffers some evidence that could demonstrate individuals at CBP could have been aware he was bisexual. Beeman testified that he told another border patrol agent about his sexuality sometime in 2013 or 2014. (Costanzo Decl. Ex. A, Beeman Dep. at 94:23-25, Ex. RR, Beeman Dep. at 95:1-13.) Another agent asked Beeman whether he was gay after a picture from Beeman's training surfaced. (Davis Decl. Ex. B. at 73:7-21.) Though these appear to have been insular situations, Beeman claims that the rumors about his sexual orientation were widespread. If a jury believes Beeman that this knowledge was so widespread within CBP then a reasonable inference could arise that Holladay and Bippley were also aware. Given the Ninth Circuit's low standard of proof at this stage, the Court finds that Beeman has established the first element of his prima facie case.

### 2.   Similarly Situated Employees

Defendant argues that Beeman cannot point to any similarly situated employee treated more favorably than him. The Court agrees.

Whether other employees were similarly situated requires the plaintiff to point to comparator employees who had similar jobs and displayed similar conduct. Vasquez v. Cnty. of Los Angeles, 359 F.3d 634, 641 (9th Cir. 2003), as amended (Jan. 2, 2004). The employees need not be identical; they must simply be similar "in all material respect." Moran v. Selig, 447 F.3d 748 (9th Cir. 2006). The Ninth Circuit has previously distinguished between employees subject to a "Last Chance Agreement" and those who were not. See Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003).

1      Beeman identifies ten comparator employees for the Court's consideration. (Resp. at 12-

2   15.) Looking at the behavior of the comparators, the Court finds the conduct of the other

3   comparators distinguishable from Beeman's. Of the ten employees Beeman refers to, only two

4   were disciplined for an arrest outside of work, similar to Beeman. (Resp. at 15; Davis Decl. Ex.

5   G, Deposition of David Hagee at 33:0-34:16.) One of the two had "multiple incidents with

6   alcohol" and was ultimately terminated for her alcohol abuse. (Mot. for SJ at 18-19, Costanzo

7   Decl. Ex. PP at USAO_008285-8286.) The employee was later reinstated, but only after

8   proceeding through arbitration. (Id.) The other employee had two infractions, one of which

9   resulted in an arrest, both stemming from interpersonal conflicts with his spouse. (Davis Decl.

10  Ex. G, Hagee Dep. at 26:19-27:16.) This employee does not remember being disciplined for the

11  arrest, as it took place back in 2011or 2012, but did state that he was placed on administrative

12  nonenforcement duties for several months. (Davis Decl. Ex. G at 33:9-34:16.)

13     Critically, neither of these two employees appeared to have any interactions with outside

14  agencies during their arrests that led to that agency complaining to CBP. This is an important

15  distinction from Beeman's arrests. Whereas the conduct noted above might reflect poorly on

16  CBP, it did not directly impact CBP's ability to work with other agencies. In both of Beeman's

17  arrests and the one traffic incident, outside law enforcement agencies complained to CBP about

18  Beeman's behavior. One of the arrests went so poorly that the police chief asked that Beeman be

19  accompanied by a supervisor in any future, work-related visits to the station. These negative

20  interactions potentially impacted CBP's working relationship with these agencies. The Court

21  finds that this distinction alone would provide CBP with justification in issuing a harsher

22  discipline for Beeman's behavior.

23

24

1    Yet, despite this, CBP opted to give Beeman another opportunity when it offered him the

2  Last Chance Agreement. In providing comparators Beeman believes were treated more favorably

3  than him, he has incidentally created an avenue to argue that he was actually treated more

4  favorably. The comparator employee with alcohol related arrests, similar to Beeman, was

5  terminated. Rather than terminate him, Bippley offered Beeman another opportunity to keep his

6  job. And Beeman fails to put forth comparator employees who were subject to a Last Chance

7  Agreement. (Davis Decl. Ex. F, 30(b)(6) Deposition of Nicolle Bombardier at 21:18-22:6.)

8  Absent comparators who were also subject to such an agreement, Beeman has failed to meet his

9  burden.

10    Because Beeman's comparators were not subject to a Last Chance Agreement and

11  because they did not have a record of misconduct comparable to Beeman's, the Court finds that

12  Beeman has failed to demonstrate that other, similarly situated employees were treated more

13  favorably than him.

14  **C.    Beeman Has Not Demonstrated that Defendant's Reasons for Removal were Pretext**

15    Beeman's circumstantial evidence is insufficient to demonstrate that Defendant's reason

16  for his termination is a pretext. In the third step of the McDonnel Douglas scheme, "the plaintiff

17  must show that the articulated reason is pretextual either directly by persuading the court that

18  discriminatory reasons more likely motivated the employer or indirectly by showing that the

19  employer's proffered explanation is unworthy of credence. Chuang v. Univ. of California Davis,

20  Bd. Of Trustees, 335 F.3d 1115, 1124 (9th Cir. 2000) (internal quotation and citation omitted).

21  "When the plaintiff offers direct evidence of a discriminatory motive, a triable issue as to the

22  actual motivation of the employer is created even if the evidence is not substantial." Goodwin v.

23  Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998) as amended (Aug. 11, 1998). But, in

24

cases where direct evidence is unavailable, any circumstantial evidence put forth by the plaintiff "must be specific and substantial in order to create a triable issue with respect to whether the employer intended to discriminate. . ." Id. 150 F.3d at 1222. Relevant to the facts here, when the decisionmaker is not the individual who allegedly made discriminatory remarks, the plaintiff must show a nexus between the other individual's discriminatory remarks and the decisionmaker's subsequent employment decisions. Vasquez, 359 F.3d at 640.

Here, Defendant has offered a legitimate, nondiscriminatory reason for Beeman's termination. Rather than being terminated, Beeman accepted a Last Chance Agreement, which required Beeman to abstain from any form of misconduct either on or off duty, for three years. (Costanzo Decl. Ex. BB at USAO_000435.) Defendant claims that Beeman was terminated because he violated this agreement by misappropriating gasoline purchased with a Government gas card. (Id. Ex. II.) In doing so, CBP determined that he engaged in the following acts of misconduct: (1) failure to provide accurate information on CBP official records; (2) use of his government card for unauthorized and unofficial purposes, and (3) violation of CBP policy. (Id. Ex. II.) Thus, Defendant established its burden of offering a legitimate, nondiscriminatory reason for Beeman's termination.

Beeman contends that he has direct evidence of discrimination due to Holladay's alleged statement that he was not going to let some "fag" work at CBP if he could help it. Whether this statement ever occurred is strongly contested but would nevertheless be an issue for the trier of fact to determine. But because Bippley was the supervisor who decided to terminate Beeman, Beeman needs to demonstrate a nexus between Holladay's discriminatory remarks and Bippley's employment decision. See Vasquez, 349 F.3d at 640. Beeman's argument as to that nexus is

1    insufficient, given the Ninth Circuit's requirement for such evidence to be "specific and

2    substantial."

3            Beeman primarily relies on an informal meeting that took place between the investigators

4    at the Office of Professional Responsibility and Bippley and Holladay, during which Bippley

5    asked whether the allegations would support the exercising of the Last Chance Agreement.

6    (Davis Decl. Ex. E, Deposition of Benjamin Simpson at 117:2-17; 118:12-15 (Dkt. No. 37-5).)

7    The primary investigator asked Bippley to allow them to proceed with criminal charges before

8    any other decision was made. (Id. Ex. E Simpson Dep. at 120:13-20.) Though Bippley did not

9    wait for the outcome of the criminal charges, that was technically within his purview as CBP

10   retained the sole discretion to determine whether or not Beeman committed misconduct.

11   (Costanzo Decl. Ex. BB at USAO_000435.) Neither investigator present at the meeting

12   remembers anything personal or disparaging being said about Beeman by either Bippley or

13   Holladay. (Davis Decl. Ex. E. Simpson Dep. at 117:2-120:20, Ex. H, Deposition of Joseph

14   Nicholson at 76:19-79:25, 104:3-106:17 (Dkt. No. 40-1).) And one investigator testified that

15   while its best practice to wait for a criminal investigation to finish, he believed the criteria is

16   different with Last Chance Agreements. (Id. Ex. H, Nicholson Dep. at 85:7-86:14.) Beeman put

17   forth no additional evidence to suggest that Holladay influenced Bippley during that meeting or

18   elsewhere to terminate Beeman.

19           Beeman also contends that no one substantiated or even investigated Beeman prior to his

20   removal. This is patently false. After a supervisor suspected Beeman of misappropriating gas, he

21   sent an email to the Joint Intake Center in Washington D.C., that then referred the matter to the

22   Office of Professional Responsibility to investigate. (Costanzo Decl. Ex. GG at USAO_000447-

23   448.) The investigators found that the evidence supported a finding that Beeman used a

24

1   Government gas card in violation of policy (Davis Decl. Ex. E. Simpson Dep. at 143:8-12.) The

2   Whatcom County Prosecutor charged Beeman with theft and official misconduct on December

3   15, 2017, though the charges were ultimately dropped. (Costanzo Decl. Ex. GG at

4   USAO_000447.) Two days later, as a result of the investigation, Beeman was terminated for

5   violating the Last Chance Agreement. (Id. Ex. GG at USAO_000450.) Beeman's claims that no

6   one substantiated the claims of his misconducted or even investigated him are contrary to the

7   evidence submitted by Defendant.

8        Beeman then argues that because the prosecutor dropped all the charges, it means the

9   prosecutor could not even meet the probable cause standard. Therefore, Bippley's decision to

10  terminate Beeman on these same grounds must be pretext. But Beeman's emphasis on the

11  prosecution is misplaced. The standards to be applied in a criminal prosecution are not relevant

12  to internal termination decisions. And CBP is not obligated to apply such standards to its

13  decisions in determining whether or not to fire someone.

14       Beeman's only evidence that CBP's reason for termination for pretext are: (1) an alleged

15  derogatory statement made by Holladay a year prior, (2) an informal meeting about the

16  investigation and Beeman's Last Chance Agreement, which Holladay attended, and (3)

17  Bippley's decision to terminate Beeman prior to the conclusion of the criminal case. Beeman has

18  not put forth any other evidence to demonstrate a nexus between Holladay's remarks and

19  Bippley's decisions.  As such, even if Beeman could establish a prima facie case, he has failed to

20  demonstrate an adequate nexus between Holladay's alleged discriminatory remarks and

21  Bippley's decision to terminate Beeman subject to the Last Chance Agreement.

22

23

24

**CONCLUSION**

Given the record and the evidence put forth, the Court finds that Beeman has failed to meet his burden to demonstrate that other employees outside his protected class were treated more favorably than him, as required to make out a prima facie case of discrimination. Even if he could, Beeman did not put forth sufficient evidence suggesting that the purported reason for his termination was a pretext. For these reasons the Court GRANTS Defendant's Motion for Summary Judgment.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 9, 2022.

Marsha J. Pechman
United States Senior District Judge